UNITED STATES, Appellant

v.

WILLARD J. PHILLIPS, Private–2, U. S. Army, Appellee

3 USCMA 557, 13 CMR 113

Lt Col William R. Ward, U. S. Army, and 1st Lt Roderick V. Brown, U. S. Army, for Appellant.

Lt Col George M. Thorpe, U. S. Army, and 1st Lt Ronald C. Meteiver, U. S. Army, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

The accused was convicted by general court-martial of the offense of desertion with intent to shirk important service in violation of Article 85, Uniform Code of Military Justice, 50 USC § 679. The sentence as approved by the convening authority included a dishonorable discharge, total forfeitures, and confinement at hard labor for five years. The findings and sentence were ordered set aside and dismissed by an Army board of review for reasons which will hereinafter appear. The case was certified to this Court by The Judge Advocate General of that service pursuant to the provisions of Article 67(b)(2), Uniform Code of Military Justice, 50 USC § 654, to determine whether a morning report entry made on November 17, 1952, was competent to prove that accused was absent without leave on June 30, 1952. The question certified must be considered in the light of other evidence in the record which bears on the questioned entry.

The specification alleges in substance that the accused, on or about June 25, 1952, with intent to shirk important service, namely; June shipment to FECOM, quit his organization and remained absent in desertion until on or about December 26, 1952. In order to prove the alleged offense, the Government introduced three exhibits into evidence. These are not mentioned in the order of their identification at the trial but rather they are referred to chronologically. The first exhibit was a special order from Headquarters, Fort McClellan, Alabama, which transferred the accused and twelve other individuals to Camp Stoneman Personnel Center, Pittsburg, California. They were to report during daylight hours, June 30, 1952, but the effective date of the change in strength accountability (EDCSA) was ordered for June 25, 1952. The accused was apparently given leave of twenty-nine days and allowed eleven days travel time by the order, as his date of departure from Fort McClellan was set for May 21, 1952.

The next exhibit contains three entries extracted from the morning reports of the gaining unit (Processing Company, 6214 ASU(P) Replacement Center, Camp Stoneman, California), which affect the status of the accused. These entries cover the period from June 25, 1952, until November 18, 1952. The last exhibit which is also a morning report entry shows accused's return to military service on December 26, 1952. These four entries are as follows:

"11 Nov 52

"Phillips Willard RA 14393191 Pvt 2 Intr to AWOL eff 0001 hrs 25 Jun 52

/s/ L W Haun
WOJG USA

17 Nov 52

"Phillips Willard RA 14393191 Pvt 2 AWOL since 25 Jun 52 to dropped fr rolls eff 25 Jul 52

/s/ L W Haun
WOJG USA

18 Nov 52

"CORRECTION (17 Nov 52)
Phillips Willard RA14393191 Pvt 2 AWOL to dropped fr rolls eff 25 Jul 52 SHOULD BE eff 24 Jul 52

/s/ L W Haun
WOJG USA"

"M/R 29 Dec 52

"Phillips Willard J RA14393191 Pvt 1  Unk Cau Ra Unk Unk
Asg & Jd fr DFR eff 26 Dec 52 conf post gdhse pend charges par 2 SO 273 Hq Ft McClellan Ala

/s/ John G Taylor
1st Lt MPC"

Before discussing the certified question, we pause to make one or two observations concerning the dismissal of the case as ordered by the board of review. At times when issues are not raised before the court-martial, certain deficiencies may not be discovered by those involved at that level. If objections had been made, they would have been noticed and possibly corrected. In this instance had defending counsel attacked any of the proposed exhibits, the Government could have obtained evidence which was relevant and which would not offend against the hearsay rule. However, as each exhibit was offered counsel was asked whether there was any objection. He specifically answered "no objection by the defense." His tactics are clearly discernible. He was not contesting an unauthorized absence, he was hoping to gloss over the damaging facts and escape a conviction of desertion. After a finding of guilty was returned he had accused make an unsworn statement, and his father testify under oath. Both established that the accused went home from Fort McClellan, Alabama, when he was released on leave from there; that he stayed at home helping his father on a farm; that he got married; and that he remained in Ashville, Alabama, until he surrendered to military authorities on December 26, 1952. With the exception of the five days' variance in reporting to Camp Stoneman, the evidence corroborated the morning report entries. While the evidence given in mitigation by his father can serve no purpose to support the findings on this appeal, it shows the availability of evidence in the event of a retrial. While we have concluded previously not to impose a waiver on an accused when an objection is not made to the introduction of similar exhibits, we do not believe he should profit to the extent of winning a dismissal, if the evidence is held on appeal to have been improperly admitted and the record discloses an available substitute.

We turn now to the principal phase of the case. As previously stated, the defense offered no evidence to rebut the showing made by the Government; but it will be observed that there appears to be a variance between the reporting date mentioned in the special order and the date the absence is alleged to have commenced. The convening authority noticed this discrepancy and, in order to remove any question of variance between the two, he approved only so much of the findings as found that the accused did, on or about June 30, 1952, go absent without leave. The board of review concluded that this did not correct the error in the finding as it found there was no relevant evidence to support the conviction. The announced reason for that conclusion was based on a finding that the first three morning report entries did not meet the official record test because they all included a reference to June 25, 1952, as the in-

ception date of the absence and this being erroneous, they were hearsay and inadmissible. The board of review then went one step further, found the Government had failed to prove an essential element of the offense, set aside the findings of guilty and the sentence, and dismissed the charge.

A reference to appropriate service regulations will assist in establishing wherein the board of review erred. Special Regulations 335–50–1, dated August 16, 1951, which governs the making of entries in morning reports, contains the following directions:

"61. *Entries required for AWOL.* —(See par. 62 for entries to be made in case of confinement of individual who is AWOL in hands of civil authorities.)

"a. *Explanation.* — An individual will be reported absent without leave when he has failed to return at the fixed time to his properly appointed place of duty, has gone from same without proper leave, or has absented himself from his command, guard, quarters, station, or camp without proper leave.

.  .  .  .  .

"c. *Data required in entry.*—Basic personnel data, prior duty status, statement that individual is absent without leave, statement of departure or return with hour of each as applicable."

Army Regulations 600–120, dated 8 May 1951, Paragraph 6a provides as follows:

"6. *Status of absentee.*—a. An absentee will be accounted for on the rolls of an organization for 29 days from the initial date of unauthorized absence, except as provided in paragraph 6, SR 600–120–1. At the expiration of the prescribed period the individual will be dropped from the rolls as a deserter."

In Paragraph 6 of Special Regulations 600–120–1, dated May 8, 1951, we find the following:

"6. *When dropped from rolls of organization as deserter.*—An absentee will be dropped from the rolls of his organization as a deserter under the following circumstances, whichever occurs first:

"a. At the expiration of 29 days from the initial date of unauthorized absence except as provided in paragraph 6c and d, AR 600–120."

Other Special Regulations provide that all United States Army Personnel in the active military service, either assigned or attached, will be accounted for daily on the morning report. In addition, they require that when data is received too late to be recorded on the appropriate daily report, it will be entered at the earliest possible date. These regulations make it mandatory for the gaining unit to account for all personnel from the effective date of the change in strength accountability. Moreover, they place an official duty on the officers charged with responsibility for keeping the records of the unit to make the entries regardless of their tardiness.

In keeping with those laws and regulations, the Processing Company, 6214 ASU(P), Replacement Center, Camp Stoneman, California, was required to make an entry concerning accused's status on June 25, 1952. This entry should have established that he was either attached or assigned on that date and that he was en route but had not joined. However, the first entry which appears in the record is dated November 11, 1952, and this has to do with accused's absence. Apparently it was on that date that the gaining unit discovered he had failed to join in accordance with his orders and that he had been absent without authority. This is not an unusual discovery as replacement centers encounter some difficulty in maintaining morning report records correctly, and on an up-to-date basis, when individuals go absent without leave while en route to join. Last minute changes of both the gaining and losing organizations sometimes make it most difficult to account for an absentee until some time after his reporting date has passed. While the record does not reveal the reason for the delay in making the entry, we are certain that had the accused complied with his order there would have been no occasion for the error. Be that as it may, we must

assume that the regulations were followed by the gaining unit and that the entry was made as soon as the unit commander discovered the accused should be accounted for as a member of his command. The entry would be unchallenged were it not for the special order issued by Headquarters Fort McClellan which cast some doubt on the accuracy of the initial date of absence. It is entirely possible that the special order issued by that Headquarters could have been amended by shortening accused's period of leave by five days and if that had happened, then the morning report entry would bespeak accuracy. However, there is a greater possibility that the reporting officer inadvertently used the EDCSA date instead of the reporting date for the commencement of the absence. We shall discard the first possibility and assume the officer making the entry advanced improperly the time of the absence without leave by five days. While we concede an inaccurate entry would affect the weight to be given the exhibit, we are unable to follow the argument that it would render it inadmissible. More particularly is that so when it is not challenged. It is well to keep in mind that the first entry of the gaining unit in point of time is dated November 11, 1952. This was some four and one-half months after the date the accused was ordered to report, and if the commanding officer of that unit was to perform his duties in accordance with regulations, it was incumbent upon him to have accused's status reflected in the company records. Had they been entered accurately, there would have been two entries—the first on June 25, 1952, the effective date of change, and the second on June 30, 1952, the reporting date. Because the gaining unit reported on November 11, 1952, by morning report entry that the accused had gone absent without leave while en route to join, it is safe to say that until the date of the entry the gaining unit had not been favored with the presence of the accused. On November 17, 1952, another entry was made in the morning report of the gaining company. This entry shows that on July 25, 1952, the accused was dropped from the rolls of that company because he had been absent without authority since June 25, 1952. This entry was made pursuant to Paragraph 6*a*, Special Regulations 600–120–1, supra. The original entry disclosed that the accused had gone absent without leave effective on June 25, 1952, and based on that date, the twenty-nine days should have expired effective July 24, 1952. The period was miscalculated by one day and apparently that error was discovered the following day as on November 18, 1952, an entry was made showing the accused to have been dropped from the rolls effective July 24, 1952. To complete the period of the accused's absence, we call attention to the last exhibit which shows that he returned from his unauthorized absence on December 26, 1952, and that he was confined in the guardhouse at Fort McClellan, Alabama, to await the filing of charges. The relevant part of that entry is that his status was changed from dropped from the rolls as a deserter to assigned and joined.

Perhaps by quoting the reason assigned by the board of review for its holding, we can point up why we arrive at a different conclusion. The board in its opinion stated:

"In the instant case there was admitted into evidence duly authenticated extract copy of morning report of accused's organization containing the entries (1) reporting the accused AWOL as of 25 June 1952, which, as we have previously observed, is patently erroneous in declaring the accused AWOL 5 days before he was required by his orders to report, i.e. 30 June 1952, (2) dropping the accused from the rolls on 24 July 1952, or immediately following the expiration of 29 days from 25 June 1952. Inasmuch as, in accordance with the evidence adduced, the accused could not have been AWOL until 30 June 1952, the effective date of the dropping entry was *within* the specified 29 day period 'from the date of the initial date of unauthorized absence' (assuming he was absent on 30 June 1952)—not at the *expiration* of such period as required by regulations. It follows that, not having been made pursuant to regulations, it can

be given no effect as a dropping entry within the meaning of the Official Records exception to the hearsay rule. Nor does the failure of the defense counsel to object to the admission of hearsay evidence render such evidence competent (MCM, 1951, subpar. 139*a*; United States v. Isbell (No. 21), 1 USCMA 131, 2 CMR 37). And, quite clearly, since the efficacy of the dropping entry was thus effectively rebutted, there can be no basis for applying the presumption of regularity and performance of official duties and, accordingly, no predicate for finding AWOL on any date earlier than the dropping entry itself."

The board of review cast out entirely the first entry showing absence because of inaccuracy and then proceeded to hold that subsequent ones were of no relevancy for the reason that they perpetuated the error. The rationale of the quoted paragraph seems to be that the entry of November 17, 1952, was incompetent because the effective date of the dropping entry was five days earlier than was directed by regulations and, therefore, the morning report was not made pursuant to law. Stated somewhat differently the opinion seems to state that an official has a duty to prepare an accurate report and if he fails to do so the record is not official. We had not understood the law to be to the effect that the duty depended upon accuracy and we cannot adopt that concept. The duty to make entries in morning reports is created and controlled by regulations and if the duty is performed the document is official regardless of its degree of accuracy. Here, the primary duty was to account for the accused, and, even though the entry is late, the status must be recorded. It is intended that the accounting be accurate but mistakes creep in. That possibility, however, does not eliminate the necessity for accounting.

The Manual for Courts-Martial, United States, 1951, paragraph 144*b*, gives the following definition of an official record:

"Official records.—An official statement in writing, whether in a regular series of records or a report, made as a record of a certain fact or event is admissible as evidence of the fact or event if made by an officer or other person in the performance of an official duty, imposed upon him by law, regulation, or custom, to record such fact or event and to know, or to ascertain through appropriate and trustworthy channels of information, the truth of the matter recorded. . . ."

Every element of that test is present in this instance and so the document is official and admissible as such. That leaves only the question of the sufficiency of the proof, and every exhibit in the record argues persuasively that accused was absent without authority. Taking the material facts in chronological order, the first entry reports that on June 25, 1952, the status of the accused became that of an absentee. While the special order casts doubt on the accuracy of the date when the absence commenced, as recorded in the morning report, it does not reflect upon the correctness of the status shown therein. With an absence without leave status established, it is then only necessary to determine the date of its inception. Accused was dropped from the rolls as of July 24, 1952, by the second entry as corrected by the third, and this is sufficient to prove that he was absent without authority as of that date (United States v. Creamer, 1 USCMA 267, 3 CMR 1). The special order indicates that the effective dates shown in the second and third entries were incorrect, according to regulations, but, again, it does not controvert the status shown to exist. Conceding the entries were misdated, the record otherwise conclusively shows when the absence status commenced. The special order fixes accused's date of reporting as June 30, 1952, and it is conclusively established that he did not report. When that order is interpreted together with the other documents, they definitely fix the status of absenteeism as commencing on June 30, 1952. Little difficulty is encountered in fixing the duration of the absence. The morning report entry of December 26, 1952, buttresses the conclusion that the accused occupied an ab-

sentee status and confirms his return to military control from that status as of that date.

The question certified by The Judge Advocate General of the Army is answered in the affirmative and the record is returned to him for action not inconsistent with the view expressed.

Chief Judge QUINN and Judge BROSMAN concur.