UNITED STATES, Appellee

v.

ELIJAH WHITLEY, JR., Private E–1, U. S. Army, Appellant

3 USCMA 639, 14 CMR 57

No. 2624

Decided January 22, 1954

LT COL Herman P. Goebel, Jr., U. S. Army, CAPT John M. Hardage, U. S. Army, and 1ST LT Ivan E. Barris, for Appellant.
LT COL William R. Ward, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted of desertion in violation of Article of War 58, 10 USC § 1530. We granted his petition to review the record for sufficiency of evidence to support the findings of guilty.

This is an unusual desertion case. The initial unauthorized absence is alleged to have occurred in Korea, but the accused surrendered himself to the military police at the Union Station in Los Angeles. How he got from Korea to the continental United States is the principal question presented by appellate defense counsel.

A corrected morning report entry, dated October 1, 1951, shows the accused on November 30, 1950, to be absent without leave from his organization which was then in Korea. A second entry of the same date indicates that accused was dropped from the rolls as of February 27, 1951. The accused dis-

putes the validity of these entries. He maintains that he lost consciousness of events after an explosion about December 5, 1950, which blew up a truck in which he was riding as a passenger. He was then en route to his organization from an Army hospital where he had been treated for frostbite. The next awareness of his surroundings was in November 1951, when he awoke on board a hospital ship. He was in a bed in a compartment, and there was a bandage on his head. The accused says that the vessel docked in the San Francisco Bay area on November 16, 1951. He was then transported to the Letterman Army Hospital. However, instead of registering upon arrival, he left the hospital without authority. Two months later, he surrendered himself to the military police at the Union Station in Los Angeles.

Prosecution and defense agree that the accused was in Korea in the winter of 1950. They also agree that the accused incurred frostbitten feet sometime during that season. Beyond this, they are in complete disagreement.

The accused claims that he was evacuated from his organization to the 64th Field Hospital at Pyongyang for treatment. He fixes December 1, 1950, as the day he left his organization and December 3, as the time he arrived at the hospital. He maintains that on December 5, he was discharged from the hospital for return to his organization. He was sent to a replacement center near the hospital, and proceeded from there to his organization on the following day. En route, the truck, in which he and about twenty others were passengers, struck a mine, or was "blown up some way," within a mile from the field artillery unit of his regiment.

The next conscious recollection acknowledged by the accused is his awakening on board a ship at sea. He was "down below in a bed." He remained awake for an unspecified period of time after his return to consciousness, but then went to sleep. When he again awoke, the ship was "pulling in" at Fort Mason, California. This was on November 16, 1951.

When the vessel docked, the accused was transported in "a long bus with beds" to the Letterman Army Hospital. He got off the bus, entered the door at the Receiving Center, went into a latrine, "walked around back," and then out again through the main gate. At that time, he fully realized he was in the Army, and that in leaving the hospital he was acting without authority. Outside, the accused met a person who identified himself to the accused as someone whom he had met at Camp Stoneman in 1948. The accused went with this friend to the latter's home in San Francisco. He obtained clothing from the friend, and stayed with him. After a time, he left his friend and went to Los Angeles. Several weeks later, he abruptly left a movie theatre, and proceeded to the Union Station where he turned himself in to the military police as being absent without leave from the Letterman Army Hospital.

The accused exhibited to the court several disfigurations on his forehead, over his right eye and just below the hairline. He attributed these to the fact that he must have received a head wound in the truck explosion in December 1950. In further support of his explanation of his absence, he introduced into evidence several entries from his soldier qualification card and service record which ostensibly conflict with the morning report entries.

Relevant entries on the qualification card show the accused as having left the United States on April 8, 1949, and a notation reflects his return from Far Eastern Command on April 1, 1951. It also appears therefrom that the accused had a physical fitness test on February 9, 1951. The pertinent service record entries show two endorsements, one by the accused's organization on February 18, 1951, indicating a transfer on December 1, 1950, to an unknown hospital, and the second, dated April 17, 1951, by Camp Omiya Station Hospital of a transfer from the hospital to Japan Replacement Training Center on January 24, 1951, pursuant to the hospital's Special Orders 8, paragraph 9.

Finally, the accused relies upon three reports of psychiatric examinations made on March 8, 1952, July 11, 1952,

and September 8, 1952. These recite accused's personal statement of his amnesia and refer to certain tests taken by the accused. Each examination disclosed some indication of memory loss, but, as will appear more fully later, each of the psychiatrists had serious reservations as to the validity of the indication.

Rebuttal evidence by the prosecution may be grouped into four categories, as follows:

(a) A stipulation, joined in by the accused, to the effect that the latest medical card pertaining to the accused on file in the office of The Adjutant General shows that the accused was admitted to the 64th Field Hospital, APO 301, on November 29, 1950, for frostbite, foot, bilateral, moderate, and his return to duty on November 30, 1950, while a member of Company H, 24th Infantry Regiment.

(b) Testimony by the custodian and Officer-in-Charge of the Fort Mason, California, Personnel Movement Division, and a civilian employee of that office, which established that the division was required by regulation to maintain records of embarkation and debarkation of all military personnel in the San Francisco Bay area. The unit was informed of the arrival and departure of all vessels carrying such passengers. A careful examination was made of the passenger list for all inbound vessels from the Far East, except Guam, which docked in the Bay area in October and November 1951. The search disclosed the names of two persons having the surname of Whitley but neither of these had the first name, serial number, or rank, of the accused. This testimony was corroborated by a stipulation, expressly assented to by the accused, to the effect that the passenger lists of vessels arriving at Fort Mason during November 1951, on file in the office of The Adjutant General, disclose no listing of a person with the name, rank, and serial number of the accused.

(c) Testimony by the Chief Clerk, Evacuation Section of Letterman Army Hospital regarding the practice of receiving patients from inbound vessels and the records of that office relating to patients returning from abroad. According to this testimony, personnel from the Evacuation Section meet all ships coming in with Army patients. These representatives go on board, receive the records, get the patients, and double check the records against the patients. All patients are then brought to the Letterman Army Hospital for further processing. No Army patients coming into the San Francisco Bay Area go to any hospital other than the Letterman Army Hospital. Part of the processing at the hospital includes a debarkation worksheet which becomes a part of the permanent file. The witness, as the person in charge of these records, made a search of the records for the years 1950, 1951, and 1952, and found no record for a "Whitley" or "Whitely."

(d) A stipulation, joined in by the accused, to the effect that the record of the U. S. Army Hospital AWLUA 079, indicate that a Corporal Elijah Whitley, RA 57430236, was transferred to Japan Replacement Training Center, APO 613, on January 24, 1951, by Paragraph 9, Special Orders 8, Headquarters, Camp Omiya Station Hospital, dated January 23, 1951. Also admitted, without objection by defense, was an order by Headquarters, Camp Stoneman, dated January 30, 1952, relating to the arrival in United States of Sergeant Elijah Whitley, RA 57430236, MOS–3060 (Cook) as a Rotatee from Sasebo Replacement Depot, APO 27.

In addition to the direct rebuttal evidence by the prosecution, mention must be made of testimony elicited from the accused on cross-examination and on questioning by the court. Pressed for some of the details of his experiences after the purported recovery from his amnesia, accused continually stated that he didn't remember much about them. He could not recall the nature and extent of any medical treatment on board the ship, whether anyone made his bed, or whether he had any meals while on board. He did not know the name of the ship. All that he did remember was

that he was lying in bed. At one point a captain came in and asked him how he felt. He replied that his head hurt and the captain remarked, "Well, it won't be long now and we'll be in." His compartment had other beds, but there was only one other occupant and that person was unknown to him. He acknowledged a lapse of time between his first consciousness and the docking of the vessel, but he claimed that he went to sleep and "was woke when the boat pulled in." He left the ship wearing a maroon jacket and blue pants. Although he recalled an officer and enlisted man standing at the debarkation point, he "went out behind a fellow" that was in his compartment. He didn't remember anyone calling off his name. He was "sure" that the date was November 16, 1951, because he saw a calendar.

Although the accused testified that he stayed with "a friend," whom he assertedly met on leaving the Letterman Hospital, at the latter's home in San Francisco, for the period from November 16, 1951, to at least late in December, he could not recall the friend's name. Neither could he find his friend when he subsequently went with a Sergeant from the Prison Records Office to the friend's supposed residence. In a like vein, the accused asserted that during his stay with his friend, he had occasional headaches. He implied that these were due to his head wound, but then said, "The thing was, I was drinking so much until . . . well, if I had had a headache I couldn't hardly tell it but I know when I wasn't drinking I had headaches occasionally." During that time he "just walked the streets and went to shows and different places."

Accused's home was in Austin, Texas, but when he left his friend he went to Los Angeles. He stayed at a hotel for two or three weeks and then surrendered himself to the military police. In that period he earned money to support himself by "working with prostitutes, and different things, gambling." Following his surrender, the accused was examined by three Army psychiatrists. On the basis of accused's statements and some tests, each doctor found some memory impairment, but each also had grave doubts as to the validity of the findings. These doubts may best be expressed by quoting from the reports.

"SUMMARY. At this time the patient has only one manifestation of anything that could be conceived of as an illness. This is his amnesia, as previously referred to. One can speculate as to the cause of this, and the most likely possibility would be that the patient did have some organic brain damage. If this is so, there is no clinical evidence or laboratory evidence to indicate that it still exists. Also, this amnesia could possibly be more apparent than real."

"Recommend: It may have been that at the time this individual was seen in the Psychiatric Clinic over two months ago that he had some mild memory impairment perhaps due to a head injury. It seems to the undersigned, however, that if this were the case he has now recovered from it. Another good possibility in view of the rather vague history that this man gives is that this entire story is manufactured out of whole cloth. It is assumed, however, by the undersigned that the reliability and of his former movements have been checked by this time. At any rate, I do not believe that there is any reason for concern about any neurological or even psychiatric disease at the present time."

"IMPRESSION: Organic dysfunction from unknown cause.

I would suggest that neurological and/or neurosurgical evaluation by [sic] obtained, since it would appear that his difficulty is primarily organic rather than functional. I think, however, that the administrative records in this case are crucial unless the evidence of organicity can be supported by physical examination, particularly if it is found that he was not evacuated through medical channels, but is a front-line deserter, or is suspected of having committed some other major offense."

Appellant concedes that a "cursory examination" of the record discloses

a "sound foundation" for conviction. However, he maintains that when the record is viewed through "the magnifying glass of appellant's corroborated testimony," the conviction is supported only by speculation and conjecture. Of course, no conviction may be upheld upon the basis of suspicion, conjecture, and speculation. United States v. O'Neal, 1 USCMA 138, 2 CMR 44. So, too, in deliberation on the guilt or innocence of an accused, a court-martial must weigh, along with all of the other evidence, the uncontradicted and not inherently improbable testimony of the accused. United States v. O'Neal, supra; United States v. Peterson, 1 USCMA 317, 3 CMR 51. Unfortunately for the appellant, magnification of the details of his own case emphasizes his guilt.

It is hard to believe that a person who is involved in an explosion on one day, and who experiences recovery of consciousness of identity and surroundings almost a year later, would express no surprise, no wonder, and ask no questions of anyone. The accused admits that there was another occupant of his compartment on the ship and that on one occasion he complained of pain in his head to a captain who stepped into the compartment, but of neither did he inquire as to where he was. Moreover, he asked no questions of the officer and enlisted man at the debarkation point; he asked no questions of the hospital personnel when he boarded the bus for the hospital; and he asked no questions of anyone at the hospital, except to learn the location of the latrine as a way-stop on his route of departure. Up to that point, whatever suspicions exist arise from the accused's story. Further suspicion appears from the fact that, notwithstanding his realization of his status as a patient and member of the Army, and with an apparent head injury which he had recently complained was giving him pain, the accused left the hospital without registering and without authority. The final touch of improbability appears in the accused's singular inability to recall

any of the necessary details of the unusual events following his recovery of consciousness. See: Appleman, Successful Jury Trials, 1952 ed, page 270.

Added to the general improbability of the accused's entire story is the strong contradiction of many of its parts. The accused says that he was returned to duty on December 5, 1950, but the morning report entries, corroborated by the entry on the accused's medical card filed in The Adjutant General's office, show an unauthorized absence on November 30, 1950. Accused's assertion that he was a patient on board a hospital ship which docked in November 1951, is convincingly rebutted by the omission of his name from the passenger lists of all vessels docking in the San Francisco Bay area in that month, and the absence of any record pertaining to the accused at the Letterman Army Hospital. Furthermore, the inconsistent entries in the accused's qualification card and service record are of no material help to him. It is quite evident that the entry purporting to show his transfer to the Japan Replacement Training Center by Special Order of Camp Omiya Station Hospital actually relates to a soldier bearing the same name, but with a different serial number and military occupational speciality classification than those of the accused. The record doesn't show how the erroneous information was transcribed into the accused's record, but we cannot overlook the fact that mistakes are made in personnel records, particularly when personnel changes in the organization are fluid. See United States v. Phillips, 3 USCMA 557, 13 CMR 113.

Two facts stand out in bold relief. First, the morning report entries, supported by the latest entry on the accused's medical card, establish the accused's absent without leave status as of November 30, 1950. Second, the principal part of accused's explanation of his return to the United States on November 16, 1951, with Fort Mason as the port of entry, was substantially contradicted by the passenger records of the inbound vessels and by the records of the Letterman Army Hospital. Coupling these with all of the other contradictions and the inherent improbability

of the accused's story, we conclude that the court-martial's findings of guilty were based upon substantial evidence. United States v. Peterson, supra.

The record does not show, and we can only guess, the answer to defense counsel's question, "How did he [the accused] negotiate the vast expanse of the Pacific Ocean?" See: New York Times, September 11, 1953, page 2; San Francisco Chronicle, September 23, 1953, page 13. That is a mystery which may remain unsolved forever. However, we cannot say that reasonable men can fairly conclude that a rational hypothesis other than that of guilt can be drawn from the evidence.

Accordingly, the decision of the board of review is affirmed.

Judge LATIMER concurs.

BROSMAN, Judge (concurring):

It is frequently charged against appellate judges that, in dealing with sufficiency cases, they tend inevitably—and with more than a little immodesty—to equate their own evaluations to those of "all reasonable men." My testimony here, therefore, will doubtless serve no useful purpose—for almost certainly it will be characterized as the exception which proves the rule. However, for some obscure reason it must be presented.

## II

Had I been a member of the court-martial which tried the accused—admittedly as I have been able to comprehend the problem through the cold pages of the record—I feel sure that I would have voted against returning the findings before us now. At the same time, I cannot with any degree of confidence describe the action of the court-martial here as one which would be rejected by all reasonable men.

This is indeed a perplexing record, and one about which I have been much disturbed. I have been unable to conclude, however—and within the test laid down in the O'Neal case, cited in the principal opinion—that we can do aught but affirm. In sufficiency situations—as we have said so frequently—each case must rest on its own bottom. In them, the presence or absence of a single fact may make all the difference—and may constitute the sole basis for an affirmance or for something less.

Here the Government presented to the court-martial a case which—unrebutted—would certainly have sustained findings of guilty. The accused attempted rebuttal and—assuming the stand—told an elaborate story of amnesia and related matters. To me, this story was uncorroborated—that is to say, in any precise usage of the term. True, it was *consistent* with many other demonstrated facts in the premises, and, I believe, not *inconsistent* with any—certainly not sharply so. This, however, does not necessarily constitute corroboration. However, this explanatory account was not effectively punctured by the Government, most of whose efforts fell short of the target. The medical evidence, for example, was distinctly inconclusive, and so was that involving a laborious check of military transport shipping lists and of Letterman Hospital registrations.

## III

The net of all this is that, on the one hand, we find a prima facie case against the accused, and, on the other, his exculpatory statement—uncorroborated save in the sense described earlier. True it is that this story is not inherently improbable, but—although it is perhaps no business of mine to say so—it is a singularly unpersuasive one in terms of odds. It seems to me that, in such an unusual situation as this, the conclusion is inescapable that we must place a high degree of credence in the determination of the court-martial. Its members saw the accused, and we have not done so, of course. In addition, they heard his story from his own lips, and were in a position carefully to observe his demeanor during the telling and as he responded to cross-examination.

In these premises, therefore, and despite—perhaps, indeed, because of—the compelling pressures of our stewardship, we should measure thoughtfully before we set aside as unreasonable an evaluation by the triers of fact of the exonerative account of an accused person. This does not mean, of course, that we will hesitate to reverse in a proper

case. Instead, it means in my view that—unsatisfying as the present record is in many respects—this is not a proper case.

## IV

In a sense one deplores the willingness of the Government to go to trial on a naked prima facie case no stronger than this one. However, we must not overlook the fact that competing, important, and understandable policies—which we may not safely challenge—must necessarily have play in this area. Indeed, the fact that the accused's story was not wholly demolished was due to no want of trying on the part of trial counsel. The present is not at all a case, I believe, in which the Government proceeded on the basis of a bare morning report case, despite the palpable availability of other compelling evidence. We see this all too often—but we do not have it here. After some travail, therefore, I concur with the majority.