UNITED STATES, Appellee

v

EDWARD S. DICKENSON, Corporal,
U. S. Army, Appellant

6 USCMA 438, 20 CMR 154

439

440

441

444

No. 6238

Decided September 30, 1955

*Guy Emery,* Esq., argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Joseph L. Chalk* and *Captain Frank C. Stetson.*

*First Lieutenant A. Kenneth Pye* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

This case concerns the conduct of an American soldier in a Chinese prisoner of war camp in Korea. We take judicial notice of the fact that ▇▇▇▇▇▇ ▇ many prisoners were subjected to severe brutality or to tremendous psychological pressures which made them do and say things which they would otherwise have avoided. The British have reported that the Chinese used the same methods on British prisoners of war. "Treatment of British Prisoners of War in Korea," Ministry of Defence (1955). However, of the fourteen assignments of error set out in the accused's petition for grant of review not one alleges that the offenses of which he stands convicted were the result of force or coercion on the part of his captors.

The accused does not contend here that if he committed any of the offenses alleged, he was compelled to do so because he was tortured, deprived of food and medicine, or subjected to incessant interrogation or to the more subtle methods of "political education" by which the Communists robbed men of their minds. Moreover, although at the trial the accused presented substantial psychiatric evidence in regard to the so-called "fence complex" which affects the mental strength of persons in confinement, he does not maintain here that the offenses of which he was convicted were precipitated in any degree by the effects of the complex. As a matter of fact, the accused does not contest the legality of many of the findings of guilty. We are not, therefore, required to determine the legal consequences of coercion, either mental or physical, or the legal effect of such subjective influences as the "fence complex," in regard to conduct in violation of the Uniform Code of Military Justice. Additionally, the accused does not assert in this Court that he was promised immunity from

prosecution for all acts of misconduct which he committed as a prisoner of war.

In sum, none of the dramatic and momentous prisoner of war problems, which have occupied the attention of the Government and the American people since the Armistice Agreement in Korea, are present on this appeal. The issues before us are entirely routine.

In November 1950, the accused was captured by Chinese Communist forces. Two months later, he was interned in Camp No. 5, Pyoktong, Korea. After the armistice, he refused to return to the United Nations forces during "Operation Big Switch," which provided for the exchange of the prisoners of war who wanted to be repatriated. However, on the evening of October 20, 1953, he approached an Indian guard at the Repatriation Center in the neutral zone. He complained of a toothache. When taken to headquarters, he notified an Indian officer that he wanted to return to the United States. The next morning, his request for repatriation was approved by the United Nations Repatriation Commission and he was returned to United States military control.

All repatriates were examined by counter-intelligence agents regarding their conduct and their treatment during captivity. The accused was flown from Korea to Tokyo, Japan, for his examination. He was quartered at the Tokyo Army Hospital, but his questioning took place at the Dai Iti Hotel, in a room occupied by one of two agents conducting the inquiry. At the outset of the examination, Article 31, 50 USC § 603, was read and explained to the accused. He indicated that he was familiar with its provisions because "the Communists had coached him on them" and G-2 (Intelligence) in Korea had

446

also explained them to him. At intervals during the inquiry, the agents told the accused that he did not have to answer any questions unless he wanted to.

The examination extended over a period of weeks. It proceeded according to a standard form of questions. Throughout the period of examination, the accused was "at ease." He had lunch and coffee breaks with the agents. On seven or eight occasions the accused went on pass. In the course of the questioning, the accused submitted several hand-written statements. Finally, on November 6, 1953, a nine-page typewritten statement was drafted by the agents. This statement was a "collection" of the oral and written information obtained from the accused. After it was prepared, the statement was given to the accused. For two and one-half hours he read it. He made certain changes in the text; he initialed each change, every erasure, and every page. The accused then swore to and signed the statement.

On termination of the counter-intelligence examination, the accused was returned to the United States. He was granted leave. When he returned, he was served with charges alleging that while a prisoner of war he communicated with the enemy in violation of Article 104 (Charge I), 50 USC § 698, and that in order to secure favorable treatment for himself he informed on other prisoners in violation of Article 105 (Charge II, specifications 1 and 2), 50 USC § 699. The charges were referred to trial before a general court-matrial.

At the close of the prosecution's case, the law officer, without objection by any member of the court, granted a motion for a finding of not guilty of specification 2, Charge II. In addition, the court-martial returned findings of not guilty on some of the allegations of the specification of Charge I. However, the accused was convicted of the remaining allegations of the specification under Charge I and of Charge II, specification 1. He was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for ten years. The convening authority approved the findings of guilty and the sentence without modification, but a board of review set aside one of the findings under the specification of Charge I. The board of review affirmed all other findings of guilty and the sentence. We granted the accused's petition for review to consider a number of assignments of error.

Our first problem relates to the legality of Charge I which alleges unauthorized communication, correspondence, and holding intercourse with the enemy in violation of Article 104. The accused's attack on this charge is twofold. First, he contends that Article 104 is unconstitutional. Second, he argues that, if constitutional, Article 104 does not apply to prisoners of war in the hands of the enemy.

Article 104 reads as follows:

"*Aiding the enemy.*

"Any person who—

"(1) aids, or attempts to aid, the enemy with arms, ammunition, supplies, money, or other thing; or

"(2) without proper authority, knowingly harbors or protects or gives intelligence to, or communicates or corresponds with or holds any intercourse with the enemy, either directly or indirectly;

shall suffer death or such other punishment as a court-martial or military commission may direct."

By its terms the Article applies to all persons, whether or not subject to the Uniform Code at the time of the commission of the offense. However, the accused contends that to apply the Article to persons not subject to the Uniform Code violates Section 2 of Article III of the United States Constitution, which describes the offense of treason, and also Section 3 of Article III which prescribes essential procedures in the prosecution of crimes against the United States. Conversely, the Government argues that global warfare has made the whole world a theater of military operations and justifies the exercise of military jurisdiction over all civilians. See United States v Ayers, 4 USCMA

**447**

220, 15 CMR 220; United States v McDonald, 265 Fed 754 (ED NY) (1920).

Although not specifically set out, the accused's analogy of Article 104 to the offense of treason implies that the Article represents only a particularization of different overt acts of treason. But, if we were to conclude that offenses under Article 104 are different and separate from that of treason and constitute violations of the laws of war, there would be no repugnancy between the constitutional provisions cited by the accused and the Uniform Code of Military Justice. See Ex parte Quirin, 317 US 1, 63 S Ct 2, 87 L ed 3. However, we need not reach those broad problems. We may assume that civilians not otherwise validly subject to the Uniform Code cannot be tried by a military tribunal if the offense charged is not a violation of the laws of war, or if martial law has not been constitutionally established. Ex parte Quirin, supra; Ex parte Milligan, 4 Wall 2, 18 L ed 281.

Ordinarily, one cannot seek "vindication of the constitutional rights of some third party." Barrows v ▮▮▮▮▮ Jackson, 346 US 249, 255, 73 S Ct 1031, 97 L ed 1586; see also George v United States, 196 F 2d 445 (CA 9th Cir) (1952), cert den 344 US 843, 73 S Ct 58, 97 L ed 656. In United States v Thompson, 2 USCMA 460, 462, 9 CMR 90, this Court indicated that we were inclined "to decide issues of law only in so far as such issues are raised in individual cases coming before the Court." Does the accused then have standing to urge the unconstitutionality of Article 104? In other words, does he fall within the class of persons described as being constitutionally free from trial by a military tribunal?

The accused's status as a person subject to trial by court-martial was not disputed at the trial. The ▮▮▮▮▮ omission, of course, does not deprive him of the right to contest jurisdiction over his person at any stage of the proceedings, including his appeal to this Court. United States v Robertson, 5 USCMA 806, 19 CMR 102. But, the accused does not deny that, at all times important to this

448

case, he was subject to the Uniform Code. The strongest assertion that he makes is that there is "grave doubt" on that point. We do not share that view.

The evidence shows unmistakably that the accused was a member of the United States Army in ▮▮▮▮▮ 1950. There was no evidence that he was ever discharged. Mere expiration of the regular period of enlistment does not alter a serviceman's status as a person subject to the Uniform Code. Article 2(1), 50 USC § 552, Uniform Code of Military Justice. United States v Johnson, 6 USCMA 320, 20 CMR 36. Consequently, the accused was and still is subject to the Uniform Code. As a person subject to the Code, he is not within the class of civilians who might have a possible objection to trial by a military tribunal for a violation of Article 104. See Ex parte Quirin, supra. As a person subject to the Code, unquestionably he can be constitutionally tried by a court-martial for a violation of its provisions. United States v Marker, 1 USCMA 393, 3 CMR 127.

To avoid the effect of his status, the accused contends that the words "all persons" are indivisible, that is, that the Article cannot be interpreted as applicable to persons subject to the Code and inapplicable to persons not subject to the Code. See: United States v Reese, 92 US 214, 23 L ed 563. The difficulty with this argument is that it disregards the clear intention of Congress that all persons enumerated in Article 2 are subject to the Articles of the Uniform Code. The particular designation in each Article is intended principally to restrict or to enlarge the general applicability of the Code as in the case of Article 104. Thus, there is no question of divisibility or segmentation.

As an alternative attack on the specification laid under Article 104, the accused contends that the Article has no application to prisoners of war in actual custody of the enemy. The contention is predicated on two theories. First, the accused maintains that of-

fenses committed in captivity are chargeable only under Article 105, which is titled, "Misconduct as a Prisoner." The argument is untenable.

Article 105 provides as follows:

"*Misconduct as a prisoner*.

"Any person subject to this code who, while in the hands of the enemy in time of war—

"(1) for the purpose of securing favorable treatment by his captors acts without proper authority in a manner contrary to law, custom, or regulation, to the detriment of others of whatever nationality held by the enemy as civilian or military prisoners; or

"(2) while in a position of authority over such persons maltreats them without justifiable cause;

shall be punished as a court-martial may direct."

Nothing in the language of that Article even remotely implies that every act of misconduct by a prisoner of war must be charged as a violation of its provisions. Its plain purpose is to prohibit one prisoner from gaining favor with his captors at the expense of another prisoner. Many crimes may be committed by a prisoner of war which have no bearing whatever on his standing with his captors. So, for example, an ordinary prisoner, having no authority over any other person, may steal cigarettes belonging to another prisoner and secretly smoke them. It can hardly be argued that the wrongdoer acted for the purpose of enhancing his stature in the eyes of his captors. Or, suppose the owner of the cigarettes detects the thief in the act, and to avoid apprehension, the thief strangles him. Is the murder to go unpunished because it was committed by the culprit while he was a prisoner of war? Yet, the offense cannot properly be charged as a violation of Article 105 because the Article requires that the act be done with the specific purpose of securing favorable treatment, not to escape apprehension and punishment for a crime.

Neither the language nor the purpose of Article 105 supports the conclusion that it embraces every offense perpetrated by a prisoner of war. In our opinion Article 105 is not a general catchall statute. It proscribes specific conduct by a prisoner of war which is in addition to, not exclusive of, other provisions of the Uniform Code. We conclude, therefore, that there is no merit in the accused's argument that Article 104 does not apply to prisoners of war because the totality of their conduct is governed exclusively by Article 105.

The second phase of the accused's argument, relating to the scope of Article 104, is based upon a strained construction of its provisions. He interprets the Article to prohibit only such communication or correspondence with the enemy as goes "across the lines, from territory under United States control to the enemy." On the basis of this construction, he maintains that the specification does not state an offense for two reasons: (1) In substance, it alleges only that the accused corresponded or communicated with the enemy, but is devoid of any allegation that he gave "intelligence" to the enemy in any way, and (2) it alleges that the offenses were committed while the accused was a prisoner of war in the hands of the enemy. It follows therefrom that the accused's communications with his captors did not go "across the lines" between the United States and the enemy. Both of the accused's reasons lack merit.

A statute must be interpreted in accordance with the declared intention of the legislature. United States v Cooper Corp., 312 US 600, 61 S Ct 742, 85 L ed 1071; Hassett v Welch, 303 US 303, 58 S Ct 559, 82 L ed 858. If the words used in the statute convey a clear and definite meaning, a court has no right to look for or to impose a different meaning. It is clearly and forcefully set out in 50 Am Jur, Statutes, § 225, page 207, that "a plain and unambiguous statute is to be applied, and *not interpreted*, since such a statute speaks for itself, and any attempt to make it clearer is a vain labor and

tends only to obscurity." (Emphasis supplied.)

As we read Article 104, none of the acts enumerated is conditioned upon, or restricted by, another. Rather, the Article prohibits separate and distinct acts, each of which is sufficient by itself to constitute the offense. Whether the two subsections of the Article state separate offenses, or are merely different modes of committing the same offense, need not detain us. See United States v Redenius, 4 USCMA 161, 15 CMR 161. Suffice it that no word in the statute indicates that the act of giving "intelligence" to the enemy qualifies or restricts the act of "communicating" or "corresponding" or "holding intercourse" with the enemy. But to interpret the Article in the way urged by the accused would require us not only to substitute and add words, but to juxtapose words. We would have to change the language to make the statute read substantially as follows: "or communicates or corresponds or holds any intercourse with the enemy by *giving intelligence to it.*" The accused contends that such a drastic change in the language and sense of the Article is required by the special conditions incident to a prisoner of war status.

Article 104 is said to demand "absolute nonintercourse." Manual for Courts-Martial, United States, 1951, paragraph 183*d*, page 339. From that premise, the accused reasons that the Article cannot be applied to a prisoner of war because the prisoner must converse with his captors in regard to his food, shelter, medical care, and other necessaries of everyday living. In short, the accused maintains that a prisoner is "not required to starve" at the risk of violating Article 104. He argues, therefore, that the only wrongful communication that a prisoner of war can be guilty of is a communication of "intelligence." The flaw in this argument is obvious.

Not every communication is prohibited by Article 104. The entire subsection in issue is qualified by the phrase "without proper authority." Conse-

quently, a communication with the enemy which is authorized is not a violation of the Article. Service custom, which merely recognizes the applicable laws of war, authorizes a prisoner of war to disclose his name, rank, and service number. The laws of humanity authorize communications in connection with the necessities of life. Long past are the days of "no quarter" when a prisoner of war was summarily put to death on capture. A prisoner of war has a recognized claim to life. In furtherance of this claim, he may demand sustenance from his captors. He may ask for, and is entitled to receive, "food, clothing if necessary, and proper lodging and medical attendance." Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 789. Moreover, the laws of war authorize communications between prisoners of war and their captors in regard to matters other than the bare necessaries of life. So, for example, a prisoner of war is required to conform to the laws, regulations, and orders of the place in which he is confined. Winthrop, supra, page 792. See also: Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949, which the United Nations Command declared that it would apply in the treatment of its war prisoners. If he is required to communicate with the enemy in the course of compliance with these regulations and orders, the communication is authorized, and, therefore, not a violation of Article 104. It is thus apparent that the practicalities of the prisoner of war status are not such as to justify an interpretation of Article 104 different from that indicated by the plain language of its provisions.

Also lacking in merit is the accused's claim that the specification laid under Article 104 does not state an offense because the communication did not pass "across the lines" between the United States and the enemy. The impassable "line" between belligerents is not geographic. The geographic line merely marks off the territory subject to the separate control of each belligerent and provides a convenient basis for estab-

lishing defensive and offensive measures. The true line between enemies is philosophical. That line is not measured by the inches, yards, or miles separating the opposing military forces. It is established and measured by the existence of a state of war. The Prize Cases, 2 Black 635, 688, 17 L ed 459; Hiatt v Brown, 15 Wall 177, 21 L ed 128; United States v Grossmayer, 9 Wall 72, 19 L ed 627.

Whatever the place, whether within or without an area controlled by the United States, there can be no unauthorized intercourse between a citizen of the United States and an enemy. In Hiatt v Brown, supra, the Supreme Court held that even the courts of each belligerent are closed to the citizens of the other. We hold, therefore, that a prisoner of war in the hands of the enemy is bound by the provisions of Article 104. He is not exempt from the provisions of that Article because he is outside an area subject to the control of the United States.

Before turning to the accused's attack on some of the findings of guilty, it is appropriate to consider his claim of error regarding the admission in evidence of his statement to the counter-intelligence agents. The statement was given to the agents twelve days after the accused returned to United States military control. The agents testified extensively to the effect that the accused voluntarily gave the statement, without threat or promise; that Article 31 was read and explained to the accused on two or three occasions; and that the accused said "that he was familiar with the 31st Article because the Chinese had coached them quite well in that Article" and had told him that "if you go back you don't have to talk because you have the Fifth Amendment and you have your 31st Article." Furthermore, the accused told the agents that he had been advised of his rights under Article 31 by an Eighth Army officer in Korea, after he had returned to the United States military forces.

The counter-intelligence agents did not inform the accused that he was suspected of the commission of an offense. They testified that they personally did not suspect the accused of any offense and they were not interrogating him to obtain information with a view toward any criminal prosecution. The sole reason for their interrogation of the accused was that he was a repatriated prisoner of war, and they were required to interrogate all such persons to obtain "counter-intelligence information." Since the accused had not returned in "Operation Big Switch" he was also questioned on matters not included in the standard form of questionnaire. The additional questions, however, pertained to "conditions in that north camp in a neutral zone." In the course of the examination, the accused voluntarily submitted two or three handwritten statements. The information obtained from the accused's written and oral statements was incorporated into the nine-page typewritten statement which was sworn to and signed by the accused.

Supplementing the agents' testimony is that of Corporal R. J. Flattley. He stated that he was a member of the accused's squad in Camp No. 5. In June 1952, he had a discussion with the accused regarding the possibility that returned prisoners of war might be court-martialed for "various things." The accused expressed the opinion that returned prisoners of war would be court-martialed for "things like in the nature of stealing food from other prisoners" but not for writing articles and making recordings.

At the trial the accused took the stand to testify on the preliminary question of the admissibility of his statement. He repeatedly stated that the agents did not tell him that he was suspected of any offense. Although he testified that he had nothing "to fear for" "regardless of what . . . [he] said in that statement," he concluded his testimony by saying that he would not have made the statement if he had believed that he was "under suspicion for the commission of any offense."

In his brief on this appeal, the accused admits that the statement bears his signature, but he says that it "is not conceded nor admitted that the contents" of the statement came from him. He maintains that it is "patently clear"

**451**

from a comparison of the statement with his educational and cultural level, his testimony on the preliminary issue, and the contents of one of the hand-written statements he made that he could not have "indirectly authored" or "understood" the final statement. This claim is not supported by the record. In civilian defense counsel's cross-examination of one of the counter-intelligence agents, the following transpired:

"Q. I read you another: 'I had a desire to escape from Camp #5, and set out to plan such. However, I was apprehended by the Chinese in that effort.' Does that sound like Dickenson?

. A. He said essentially the same words there; very little change there.

"Q. 'They finally released me from jail, and as a result of that gesture of consideration;' is that Dickenson talking?

A. Essentially that is his words, sir.

"Q. Essentially?

A. Yes, sir.

"Q. Well, now, Captain, let me make it clear. I am not attempting to imply that you added anything to any statement made by anyone interrogated by you. I am only trying to find or to show the court, if it is there to be shown, how much of this, what this grammatical correction of his statement may have amounted to.

A. Well, we corrected the statement grammatically; but, as I said before, and I say now, we did not change the fundamental content of the statement. The content of the statement, everything in that statement is what Corporal Dickenson said.

"Q. What you mean is that you took the thought he expressed and expressed it a little better?

A. No, sir, it was his thought; it was not my thought.

⋅ ⋅ ⋅ ⋅ ⋅

"Q. I tried to make it clear, Captain, I didn't mean to accuse you of distorting it. I am only trying to find out how far you went in editing it.

⋅ ⋅ ⋅ ⋅ ⋅

"Q. Captain, I will say it again to the Court, I have no idea that you distorted it. I am only trying to locate the source of these high-sounding phrases. If you did not, and you assure us now that you did not change anything but grammar, and I presume by grammar, you are talking about punctuation and things of that sort.

A. Well, I changed some misspelled words, for example, that were not spelled correctly. I think Lieutenant Cole did, too, but the statement is his own. I can't say anything about distortion, because I absolutely did not distort it."

The agents testified unqualifiedly that the statement embodied the essence of the information given to them by the accused in oral interrogations and in two or three preliminary handwritten statements submitted by the accused. Their testimony is uncontradicted. Moreover, in his testimony on the admissibility of his statement, the accused stated that he talked to the agents freely about the "activities of prisoners of war in Camp Number 5," and his own conduct as a prisoner of war. Substantial unrebutted evidence, therefore, supports the conclusion that the accused himself supplied the facts recited in his statement. Hence, the law officer's ruling admitting the statement must be sustained. United States v Dykes, 5 USCMA 735, 19 CMR 31; United States v. Gibson, 3 USCMA 746, 14 CMR 164.

As to the accused's understanding of the contents of the statement, the agents emphatically testified that the accused read it for two and one-half hours; that he corrected the text; and that he signed and swore to the truth of its contents. The substance of their repeated testimony on that point is fully expressed in the following excerpt from the record.

"A. It was at least two hours and one half. Lieutenant Cole said it was probably three hours, but it was a good two hours and one half, and he questioned us—I mean, we questioned him on each page: 'Now, are you sure

that is what you said?' He said, 'Yes.' And it came to the first page, 1 believe, or the second page, and he said, 'No, I don't want this stated like this,' and he drew the line through that; he changed a month from November to October, and he changed the name of Paul Schnur—he struck the name of Paul Schnur out. Everyone of those pages have initials on them—his initials, which indicate that it wasn't a case of reading one page or two pages—I think that itself indicates that he read every one of the pages."

Again, there is no substantial contradiction of, or inconsistency in, the agents' testimony. On cross-examination, the accused was specifically asked if one of the agents had lied in his testimony; his answers are as follows:

"Q. You have heard the evidence in court of a prior witness on this subject. Is it your testimony that that witness lied?

A. In some things, yes, sir.

"Q. In what things did he lie?

A. In where he was asked if he bought me any beer or anything."

A great deal of the statement discloses details of the accused's activities in the prisoner of war camp that could have been known only by him. On the basis of this evidence, the law officer was justified in concluding that, notwithstanding the accused's limited academic background, he fully understood and fully adopted the statement as his own. United States v Thomas, 6 USCMA 92, 98, 19 CMR 218; United States v Ransom, 4 USCMA 195, 202, 15 CMR 195.

Finally, the accused argues that his statement to the agents is inadmissible because he was not informed of the offenses of which he was suspected. He contends that in spite of the lack of personal knowledge on the part of his immediate examiners, he was, in fact, suspected of an offense by other intelligence officers in the United States. It appears that in May or June 1953, counter-intelligence agents at Fort Knox, Kentucky, obtained possession of certain letters written by the accused to his parents and to the editor of his home town newspaper. The accused argues that since the counter-intelligence agents in Japan and those at Fort Knox, Kentucky, are both responsible to G-2, United States Army, "the knowledge or notice of a principal is imputed to the agent." And he reasons that because of the Fort Knox agents' activities the Tokyo agents must have known that he was suspected of an offense.

Aside from the unsupported assumptions that the Fort Knox agents were engaged in a criminal investigation against the accused, that their knowledge is imputable to the G-2, United States Army, and that this imputed knowledge is further imputable to the agents in Tokyo, the principles of law upon which the accused relies are inapplicable to the present situation. ■■■■■ Agency should not be confused with the chain of command in the military community. United States v Johnson, 5 USCMA 795, 799, 19 CMR 91; United States v Dandaneau, 5 USCMA 462, 18 CMR 86. The relationship of superior and subordinate is not the same as that of principal and agent. The former represents a status which has no regard to the consent of one to be represented by another; an agency, however, is founded upon consent. 2 Am Jur, Agency, § 2, page 13. On the basis of the accused's theory, it might be argued that the knowledge of the President must be imputed to a new recruit, because the President is his Commander-in-Chief, and, therefore, his principal. Such a contention is patently absurd. Of course, there may be circumstances, as hypothesized by the accused, from which it may reasonably be inferred that the knowledge possessed by a superior is also possessed by his subordinate. The inference, however, would arise from the facts, not from the mere command relationship between the two. We need not elaborate further on the question. We may assume for the purposes of this case that the counter-intelligence agents had reasonable cause to suspect the accused of the commission of offenses under the Uniform Code. We may also assume, as urged by the

accused, that certain questions in the standard questionnaire indicate that the agents had some connection with law enforcement. What then is the effect of their failure to inform the accused of the nature of the accusations against him?

In United States v O'Brien, 3 USCMA 105, 11 CMR 105, a death case, we reviewed the effect of a failure to inform the accused of the nature of the offense of which he is suspected. We there said:

". . . True it is that such a statement on the part of an interrogating official is required by Article 31(b) as a preliminary to a warning that no statement need be made and that any provided may be used in evidence. Therefore, in at least a formal and technical sense, the failure here in question, if any, may have constituted error. However, there is no doubt that the crux of Article 31(b) lies in its requirement of a warning that the suspect is obliged to make no statement—not in its direction that he be informed of the nature of the offense under investigation. Accordingly, a failure in this latter particular does not warrant the emphatic proscription accorded the former in United States v Wilson and Harvey (No. 647), 2 USCMA 248, 8 CMR 48. . . . See also United States v Duffy (No. 1404), 3 USCMA 20, 11 CMR 20. . . . In the vast majority of instances a military person subjected to questioning will not long be in doubt as to the object of his interrogators. Although we believe that a failure to advise such a person of the nature of the offenses of which he is accused, or suspected may constitute error, it is at the same time one which will be deemed prejudicial in only the rare and unusual case."

The accused posits this case as "the rare and unusual case" to which we referred in *O'Brien*. He argues that he "had no means of knowing even of the existence of Article 105," since the Uniform Code took effect after his capture and that diligent search has disclosed no case in which a prisoner of war was prosecuted for wrongfully communicating with the enemy. The Government concedes that the case is uncommon from the viewpoint of the number of prosecutions for acts of misconduct by a prisoner of war, but it denies that the accused was prejudiced by the agents' omission. After a careful review of the evidence, we are convinced that the accused was not harmed by the failure to inform him of the nature of the offenses of which he may have been suspected.

In his testimony in connection with the admissibility of his statement, the accused said he knew that the inquiry was for the purpose of getting "the line-up of what the POW's conduct were in camp." He did not in any way contradict the prosecution's evidence that, as early as 1952, he had expressed the belief that prisoners of war who returned to the United States would be court-martialed for certain kinds of misconduct committed during their confinement. Moreover, according to his pretrial statement, he had been informed by the Chinese that if he chose repatriation, his articles and recordings would be turned over to the United States authorities and he would be prosecuted by them for collaboration with the enemy. Throughout the examination, the accused was carefully and repeatedly advised that he did not have to make any statement whatever but if he did make one it could be used against him in a court-martial. At every "pointed question" the examiners told the accused, "Now, you don't have to answer that . . . unless you want to." The only conclusion that can be drawn from this evidence is that the accused was not prejudiced by the alleged omissions of the counter-intelligence agents in advising him of his rights under Article 31. United States v Johnson, 5 USCMA 795, 803, 19 CMR 91.

We now reach the question of the sufficiency of the evidence to support the findings of guilty. We noted earlier in this opinion that the accused does not appeal from part of the findings of guilty of the specification of the charge that he wrongfully communicated, corresponded, and had intercourse with the enemy in violation of

Article 104. As modified by the findings of the court-martial and the action of the board of review, the specification of the Charge reads as follows:

"Specification: In that Corporal Edward S. Dickenson, United States Army, 9901st Technical Service Unit, Surgeon General's Office, Walter Reed Army Medical Center, Washington, District of Columbia, while a prisoner of war in the hands of the enemy, did, at or near Pyoktong, North Korea, from on or about June 1951 to on or about September 1953, without proper authority, knowingly communicate, correspond and hold intercourse directly and indirectly with the enemy by joining with, participating in, discussion groups conducted by the enemy proposing, developing, discussing and reflecting certain views and opinions that the United States conducted bacteriological warfare in Korea, that the United States was an illegal aggressor in the Korean conflict and that communism should be embraced by the prisoners of war; by making a recording of a speech inimical to the interests of the United States on or about 13 December 1951, intended for radio broadcast and purporting to be directed to Mr. and Mrs. V. B. Dickenson, Big Stone Gap, Virginia, by signing and circulating petitions among other United States prisoners of war criticizing the United States for participating in the Korean conflict; by writing for publication articles inimical to the interest of the United States that were printed in 'Towards Truth and Peace,' a camp newspaper, exact dates unknown, and contained in a letter mailed to and received by the Editor, The Post, Big Stone Gap, Virginia; by acting as an informant to the enemy regarding the activities of Robert E. Vincent in criticizing the said Corporal Edward S. Dickenson for talking about germ warfare, about August 1952; of Lyle W. Jacobson, McGreevey, Lukacinsky, Timpara, Deweese, Gardino and Brooks, in criticizing and mimicking Chinese guards, more exact date unknown; of Lyle W. Jacobson in telling the said Corporal Edward S. Dickenson that he would take care of him on repatriation, about the spring of 1953; of Wallace L. Dunham in expressing sentiments unfavorable to Communism, about December 1951; all of whom were United States prisoners of war; and by aiding and assisting the enemy to influence the following named United States prisoners of war to accept and follow the philosophies and tenets of Communism, namely, Johnny W. Moore, Franklin Barrett, William C. Hansen."

The accused does not contest the sufficiency of the evidence to support the findings that without proper authority he did knowingly communicate, correspond, or hold intercourse with the enemy by (1) joining and participating in discussion groups developing and reflecting views that the United States conducted bacteriological warfare in Korea, etc.; (2) recording a speech in December 1951, intended for radio broadcast, which was inimical to the interest of the United States; (3) signing and circulating petitions criticizing the United States for participating in the Korean conflict; (4) writing articles inimical to the interests of the United States which were printed in the prisoner of war camp newspaper, entitled "Towards Truth and Peace"; (5) acting as an informant for the enemy in August 1952 in regard to the activities of R. Vincent, a prisoner of war, in critizing the accused for talking about germ warfare; (6) aiding and assisting the enemy through influencing prisoners of war, J. W. Moore, F. Barrett, and W. C. Hansen to accept and follow the philosophy and tenets of Communism. Also, as we pointed out earlier, the accused does not contend that any of the acts of which he was found guilty were committed because he was physically or mentally coerced by his Chinese captors, or because he was suffering from the effects of the "fence complex." The accused's attack is limited to those parts of the specification of Charge I which allege that he acted as an informant regarding the activities of certain named prisoners of war.

Chronologically, the first act of informing of which the accused stands

**455**

convicted occurred in December 1951. On the tenth of that month, a group of ten prisoners of war arrived at Camp No. 5. W. L. Dunham, an American soldier, was one of the group. The next evening, the accused came to the squad tent which housed the group and talked with Dunham. He told Dunham that "there were a lot of fellows" in the camp who believed in Communism and he was trying to find out those who did. Although he denied that he himself believed in Communism, he acknowledged that he had written articles for the camp paper. The accused questioned Dunham about his feelings regarding Communism. Also, he inquired about Dunham's family and educational background. These inquiries by the accused continued for several nights.

Dunham told the accused about his family and his background. He "ridiculed" the Chinese and expressed his belief in an equality of rights for negro and white. Less than two weeks after the talks ended, Dunham was called to the Chinese camp headquarters. Some of the others in the squad had not talked to the accused during his visits to the tent. None of these men were called to headquarters.

At the camp headquarters, Dunham was "confronted with the same things . . . [he] had told Dickenson." Many of the statements that he made to the accused were "given to . . . [him] verbatim." Many of the details of his background were covered "just as accurate as . . . [he] had told them to Corporal Dickenson." The Chinese informed Dunham that he needed a lot of "education and training" because of his "subversive attitude toward their beliefs." For two days, "all day long," Dunham was given a "bad time" by the Chinese.

It is axiomatic that a conviction cannot be sustained on the basis of suspicion or surmise. United States v Whitley, 3 USCMA 639, 14 CMR 57; United States v O'Neal, 1 USCMA 138, 2 CMR 44. As Bacon said long ago:

"Suspicions amongst Thoughts are like Bats amongst Birds, they fly ever by Twilight. Certainly they are to be repressed, or at least well guarded; for they cloud the mind, they leese [lose] friends, and they check [interfere] with business, whereby business cannot go on currently and constantly. They dispose Kings to tyranny, husbands to jealousy, wise men to irresolution and melancholy. They are defects, not in the heart but in the brain. . . . There is Nothing makes a Man suspect much, more than to Know little; and, therefore, men should remedy suspicion by procuring to know more. . . ."

But in this case there is far more than suspicion; there are cold, solid facts. The findings of guilty are supported by the evidence and the reasonable inferences to be drawn therefrom. Here, the uncontradicted evidence shows the following: (1) At the time of his conversation with Dunham, the accused had written articles for the camp newspaper; (2) the accused was engaged in ascertaining the attitudes of the other prisoners of war toward communism; (3) the accused approached Dunham almost immediately after his arrival, and questioned him about the details of his family and educational background; he also solicited his opinions on various political and sociological questions; (4) a short time later, the Chinese captors confronted Dunham with a "verbatim" record of his statements to the accused. The accused contends that these facts are insufficient to justify the inference that he communicated Dunham's sentiments to the enemy.

Relying upon the well-established principle that the evidence must exclude every reasonable hypothesis except that of guilt, the accused maintains that a proper evaluation of two facts requires reversal of the findings of guilty. First, he maintains that there were ten men present in the squad on each occasion that the accused conversed with Dunham, and any of these could have acted as the informer. Second, he stresses the date of the incident. He asserts that the accused was then an ordinary prisoner unpossessed of a "bad reputation" as an informer or communist sympa-

thizer. Neither of these circumstances establishes a reasonable basis for an inference that someone other than the accused communicated Dunham's personal data and ideas to the enemy.

The ten men sharing the hut with Dunham were all new arrivals. There is no evidence to indicate that any of them were predisposed toward the Chinese, or had any motive to disclose to the camp officials information about Dunham. Although Dunham was cross-examined at length, he was not asked whether any of them were in such close proximity to him and the accused as to overhear their conversation in "verbatim" detail, and it does not appear that such was the fact. On the other hand, while the accused might not have had a "bad reputation," he did have a close connection with the Chinese. He had already written articles for their camp newspaper and made at least one recording for radio broadcast. Under these circumstances, to imagine that someone other than the accused told the Chinese about Dunham is speculation, not reasonable hypothesis.

The remaining two findings of guilty under the specification of Charge I, which the accused maintains are not supported by the evidence, relate to the activities of L. W. Jacobson, an American prisoner of war, and some of his friends. The first incident took place in April 1953. Jacobson and seven "trusted friends" were in their billet. This was a room about six feet long and five feet wide. A hole in the wall, about four feet above the ground, served as a window. One evening, Jacobson and the others, were engaged in criticizing the Chinese and "more or less mimicking . . . [them], making fun of them." Jacobson started to leave the hut to go to the latrine. As he stepped outside, he saw the accused "around two feet—three feet" from the window. He was "standing there, more or less just looking down at the ground." At that time, the accused was generally reputed to be an informer for the Chinese. Jacobson turned back into the hut and motioned to the others to "hush up." About 6:00 a.m. the next morning, just after roll call, Jacobson was "called up" and interrogated by a Chinese known as "The Skull." He was questioned about "what we were talking about and what the discussions contained." He kept "more or less, refusing them." Then, they "started throwing everything that we were talking about right in my face." The interrogator had "it all writ down on a piece of paper in Chinese, more or less just like he had been sitting in there himself."

According to Jacobson, the group would "look around, make sure nobody was around" before they engaged in their talks. On the particular evening in question, no one was "outside the window" when they "first started." He further testified that "all the members of the group were men who could be trusted and I know that no one from the group informed on our discussions."

The accused contends that there is "scant evidence" to support the finding of guilty that he informed on Jacobson and the others. He argues that if there was an informant it might have been any of the five hundred other prisoners of war in the camp, or one of the seven occupants of Jacobson's billet. In further support of his argument, the accused has moved this Court to consider the testimony of a former prisoner of war named Fields, which was given in the case of United States v Batchelor, CM 377832, 19 CMR 452.

The motion to consider was filed after oral argument in this case. The Government opposes the motion on the ground that the record of trial in the *Batchelor* case is no part of the proceedings here. This view is sound. United States v Whitman, 3 USCMA 179, 11 CMR 179; United States v McKnight, 4 USCMA 190, 15 CMR 190; United States v Gordon, 2 USCMA 632, 10 CMR 130. Cf. United States v Ferguson, 5 USCMA 68, 17 CMR 68. Additionally, we are not disposed to take judicial notice of specific testimony in another case. 20 Am Jur, Evidence, §§ 83, 87. In any event, the new evidence presented by the accused can be considered only for the purpose of determining whether justice requires that he be granted a rehearing

on the disputed allegation. However, we are willing to consider the motion arguendo, and as we will point out later, the new evidence would hardly produce a more favorable result for the accused if we ordered a rehearing.

The essence of the accused's argument is that someone else could have informed upon Jacobson's group. Jacobson testified that the group always took precautions to be sure that no one was around when they engaged in criticism and mimicry of their captors. There were "quite a few" informers about, and they "couldn't hardly trust anybody." On the evening in issue no one was outside the window when they started the conversation. Later, the only person seen was the accused, and he was standing about two or three feet from the window "just looking at the ground." About 6:00 a.m. the next morning, Jacobson was "called up" and questioned in regard to the conversation. The concurrence of events is too coincidental to indicate that someone in the camp, other than the accused or one of the members of Jacobson's group, reported the conversation. Is there then a reasonable basis from which to conclude that one of the group made the report?

All the prisoners of war in Jacobson's group were his "trusted friends." Jacobson testified, without contradiction or impeachment that he *knew* that none of them "had informed on our discussions." More important, however, is his uncontradicted testimony that none of the group left the hut after he discovered the accused outside the window. Yet, early next morning, he was interrogated by a camp official, who was as thoroughly informed about the conversations as if "he had been sitting in there himself." The information was "all writ down on a piece of paper in Chinese." If one of the group was the informant, he had either to leave the hut, without Jacobson's knowledge, some time during the night in order to make the report, or to submit the information between reveille and roll call. The latter possibility is materially lessened by the shortness of the time in which the report would have to be made, reduced to writing, and instructions issued to bring in Jacobson for questioning.

The accused attempts to discredit Jacobson's testimony by noting that it is doubtful that he could read Chinese. The record is silent on that point. But, even if Jacobson could not read the language, that circumstance does not destroy his credibility. His testimony merely indicates that his interrogator possessed a paper which contained Chinese letter characters, and that he referred to this paper in his questioning of Jacobson.

As for the possibility that one of Jacobson's group left the hut during the nighttime to report the conversation to the Chinese, there is just no evidence to support it, and Jacobson's testimony weighs heavily against it. It is in this area that the evidence presented by the accused in his Motion for Reconsideration has some bearing. According to the accused, Fields, the former prisoner of war who testified for the prosecution in the case of United States v Batchelor, supra, was one of the persons who comprised Jacobson's group. Fields testified in the *Batchelor* case as follows:

(Redirect Examination by Trial Counsel)

"Q: Sergeant, this confession that you signed, all the bad things that the Chinese said about you, most of them were true. Is that correct?

A. Yes, sir.

"Q. When you were up at regimental headquarters and having your talk with the Chinese, that is, around 9:30 after you had been standing at attention, when they brought in the papers, was the rock-throwing incident mentioned?

A: Yes, sir.

"Q: In what way? Will you explain that to the court?

A: He asked me, this Tong, he asked me why I threw the rock against the Progressive club room. I told him I didn't throw it, and he wanted to know who threw it. I told him Billy Clark threw it. He wanted to know if I had him to throw it. I told him, 'No, I didn't have him to

throw it.' He kept carrying on like that, and he said, 'They saw you throw it.' I said, 'Who saw me throw it?' He said 'Batchelor and Moore saw you throw it.' I told him no, I said, 'They are lying. They never saw me throw it. I didn't throw it.'"

(Recross-examination by Assistant Defense Counsel)

"Q: And did he then ask you who threw the rock against the Progressive club room?
A: He asked me if I didn't throw it, who threw it?
"Q: And what was your answer?
A: I told him I didn't throw it.
"Q. Did you tell him who did throw it?
A: I told him who threw it.
"Q: Then you informed on the person that threw the rock. Is that correct?
A: That is correct."

There are serious deficiencies in the accused's charge that Fields was an informer who might reasonably disclose the group's conversations. Rather than siding with his captors, it is evident that Fields gave them considerable trouble. Thus, he signed a confession that he had done "bad things" in regard to the Chinese. It is equally evident that he did not seek out the Chinese to disclose information to them. Instead, he was obviously brought to the camp headquarters and made to stand at attention as a punitive measure, designed to elicit answers from him in an inquiry into an offense in which he was the chief suspect. Inescapably, therefore, Fields' testimony in the *Batchelor* case gives support to Jacobson's testimony in this case that he trusted his friends. In no sense is it beneficial to the accused. Considering the evidence in this case, there is no reasonable basis from which to infer that one of Jacobson's group rather than the accused reported the evening's conversation. The evidence is legally sufficient to support the finding of guilty of the allegation in the specification of Charge I that the accused acted "as an informant to the enemy regarding the activities of Lyle W. Jacobson" and the other prisoners of war named in the specification in "criticizing and mimicking Chinese guards."

The second incident between the accused and Jacobson occurred in July 1953. During that month Jacobson saw the accused on "a few occasions." On those encounters, he told the accused that "when we got back . . . he'd be taken care of." "Shortly thereafter" he was called up to camp headquarters. His testimony as to what transpired is as follows: "I was called back up and more or less given a working-over, and they said that was for threatening progressive students and accusing them of different things, and threatening them, trying to interrupt their studies, and scare them off in believing in Communism and different things of that nature."

In contesting the sufficiency of the evidence to show that he informed the Chinese of Jacobson's statements, the accused contends that there is nothing to indicate who "they" are, and also that "they" made no reference to the accused as the "progressive" who had been threatened. These assertions supply little basis for discussion. As we pointed out in United States v Voorhees, 4 USCMA 509, 529, 16 CMR 83, 103, general terms may acquire a specificity of meaning from the surrounding circumstances. There is little doubt that in the context of his testimony, Jacobson's reference to "they" meant the Chinese captors, and that "progressives" included the accused. Here, as in the preceding instance, Jacobson's contact with the accused was followed by a summons to appear before the camp officials who then confronted him with his earlier assertions. Although his tormentors' explanation for his "working-over" was broader than the cryptic threat to Dickenson, it is evident that the Chinese were expressing the threat's effect rather than its terms. The succession of events described by Jacobson gives rise to but one rational inference—that Dickenson reported Jacobson's threat to "take care of him on repatriation." This testimony stands unimpeached and unmodified after vigorous cross-examination by the defense.

**459**

No other evidence was introduced to rebut it or explain it away. The findings based upon it, therefore, should not be disturbed. United States v Williams, 4 USCMA 69, 15 CMR 69; United States v Blevens, 5 USCMA 480, 18 CMR 104.

The remaining issues included in our grant of the accused's petition for review relate to Charge II. Initially, there were two specifications to the charge. The law officer granted a motion for a finding of not guilty as to specification 2, but the court-martial convicted the accused of specification 1. That specification alleges that without authority and for the purpose of securing favorable treatment by his captors the accused reported to the enemy that Pfc. E. M. Gaither was preparing to escape, and that as a result of the report Gaither was severely beaten, placed before a mock firing squad on three occasions, and confined for about seven months. The accused contends that the evidence is legally insufficient to support the finding of guilty.

Five witnesses testified directly in connection with this offense. Four of them appeared for the prosecution. One for the accused. The accused himself did not testify.

Gaither was the major prosecution witness. He, like the accused, was a prisoner of war in Camp No. 5. In July 1952, Gaither and a fellow prisoner, Lauri, were engaged in preparations for an escape. According to Gaither, the accused knew of their preparations. Part of the equipment Gaither and Lauri planned to take was an "air panel," which was to be used to attract attention from friendly aircraft. Gaither did not describe his panel.

The panel was buried in the ground under the wooden floor boards of Gaither's hut. His bed covered the area. One day, the accused asked Gaither to help him make a panel. Gaither took his from its hiding place and showed it to the accused. No one else was present. However, seven or eight men in Gaither's squad including Lauri knew "about this." The accused thanked Gaither and "said he was going to make one." The next day it rained.

The accused "came up" to Gaither and showed him an air panel which he took from under his jacket. Gaither testified that the panel was "one of the same sort" as his, and he believed that it "must have been made" that morning. He did not otherwise describe the accused's panel. The accused informed Gaither that he was going to escape that night.

The accused and prisoners of war Fred Obroff, Martin Christensen, and Virgil A. Rutherford actually left camp. They completed their plans to escape somewhat earlier than the time of their departure, but they had waited for a dark, rainy night in which to make the actual attempt. That night came on July 24 or July 25. They crawled through camp and "out over" to the Yalu River bank. However, they did not get far or stay at liberty long. They had had to pass the Northern outskirts of the village and had only gone about two miles from the camp itself when dawn broke. They were in an open area and were unable to conceal themselves effectively. At about 9:00 a.m. they were recaptured by two Chinese, one of whom was an "instructor" named Tong, and brought back to camp. Rutherford, who testified for the defense, stated that he had no reason to believe that the Chinese had been "tipped off" on the escape.

According to Obroff the escape party carried two compasses, a map, and one air panel. The latter was in a bag carried by the accused. This panel was obtained by Obroff from a prisoner named McMillan about a day before the escape. Obroff described the panel as "a piece of blue material, which was made from the Chinese clothing . . . they had given us, and it had a big white star in the center. It was made on the order of the Air Force patch." The panel was about five feet in length and two feet in width. When they were recaptured, the pack containing the air panel was not taken back to camp; it was left at the place of their recapture.

On return to camp, Obroff, the accused, and the others were brought to regimental headquarters. Dicken-

460

son was taken inside the building; the others were made to stand at attention in the sun. About one and one-half hours later Dickenson came out with two Chinese. They left the area, but "a short while later" they came back with the pack containing the air panel. The panel was removed and stretched across the clothes line. Obroff identified it as the one he had obtained from McMillan. He also identified the pack. After a few hours of standing at attention, Obroff was also questioned. His interrogator seemed to know all the details of their escape.

Christensen corroborated Obroff. He testified that Dickenson was the first to be interrogated by the Chinese after their recapture. Then when he was questioned, "They knew the whole thing."

A day or two later, camp officials came to Gaither's billet; among them was Tong. Everyone present was ordered outside the hut. The captors went "directly" to the place where Gaither had hidden his escape equipment. They gathered it up and took Gaither to company headquarters. There he was questioned about his plan for the escape; he was beaten with clubs and with ropes to make him disclose who was going with him. Later he was taken outside and made to stand at attention. On that occasion he saw Lauri, his intended escape-mate in a room in the building; Lauri was being beaten. After about 25 minutes of standing at attention, Gaither was confined in a storeroom for "most of the night." Thereafter he was taken to regimental headquarters and subjected to further questions and beatings by Tong. He was then taken outside and put before an eight or nine man firing squad. On command each of the squad raised his rifle, inserted a round in the chamber, and then put the rifle down. The squad was marched off.

Tong approached Gaither and pulled his identification tags from his neck. He asked Gaither if he wanted "to see . . . [his] family again." On receiving an affirmative reply, Tong told him that Dickenson "was locked up" because he had tried to escape but that

he wasn't "going to be in jail long and you won't be in jail long either if you do what I tell you." Tong thereupon asked for "the names of the men in the company who are going to escape" and for other information. Gaither refused to provide any information and he was again beaten and confined in jail. At sometime "when the Chinese were interrogating" him, Gaither said they showed him two air panels. Gaither testified that "one was mine and one was Dickenson's."

Gaither remained in jail for seven months. In that time he faced two more mock firing squads and suffered further beatings. According to his testimony, the accused was also confined but in another building which had no guards. The accused had his "equipment" and he went out on work details. On occasion, the accused brought the food for the inmates of the jail. Gaither regarded the accused as a "trustee." He showed no scars from beatings on him.

Obroff testified that about ten days after the abortive escape the accused was brought to the same jail and they "whispered a bit." Obroff wanted to know who told the Chinese about their escape. He asked Dickenson "if he had told them certain things about the compass and the panel"; he also asked "did he tell the rest of the stuff." The accused said "Yes, I had to tell them. They put a gun to my head." Obroff also was beaten. He did not know whether the accused was punished, and he observed no signs of "physical mistreatment upon the accused." The final evidence bearing directly on Charge II appears in the testimony of Harry Gennaro, one of the prisoners of war in Gaither's squad. He corroborated Gaither's testimony regarding the seizure of the hidden escape equipment. He also testified that candy and "tailor-made" cigarettes were not normally available to prisoners of war in the camp, but "after June or July 1952" he saw the accused with both items.

As part of his argument, the accused points to a number of alleged inconsistencies in the testimony of the various witnesses. For example, he stresses the fact that Gaither believed that the

accused had made the air panel which the Chinese had exhibited to him, whereas Obroff testified that the panel was given to him by McMillan. Whether these inconsistencies, if such they are, can be properly explained as the Government contends, need not concern us. While we can disregard testimony which is inherently incredible or manifestly unbelievable, we have no power to decide conflicts in the evidence or to weigh the testimony of one witness against that of another. We have authority to review the evidence only for the purpose of determining the ultimate legal effect. The only question for our consideration here is whether there is substantial evidence in the entire record of trial to support the findings of guilty. United States v Dodd, 2 USCMA 94, 6 CMR 94; United States v Logas, 2 USCMA 489, 9 CMR 119. We must determine whether the evidence affirmatively shows that the accused informed on Gaither "for the purpose of securing favorable treatment by his captors."

One fact stands out clearly, namely, the accused disclosed to the Chinese the details of his own escape. He stated as much to Obroff. But did he also tell them about Gaither's cache? We believe it may be inferred from the evidence that after his abortive escape, the accused was questioned not only about that, but also as to his knowledge of other prisoners who contemplated escape. Certainly Gaither was asked for such information. Obroff's testimony implies that questions of that nature were put to him. Thus, he asked the accused if he told the Chinese about the compass and the panel; then he asked if the accused told them about "the rest of the stuff." By itself, the latter statement is somewhat ambiguous. However, questions about the escape plans of others would logically be asked of a prisoner caught in such an undertaking. Obroff's statement, therefore, can be construed as a reference to such questions. From these circumstances, the court-martial would be entirely justified in concluding that the accused was asked for the same

462

information. Once that conclusion is reached the other evidence amply supports a finding that the accused answered the questions by telling about Gaither's cache of escape equipment. The accused knew of the hiding place. He admitted that he revealed the "rest of the stuff" to the Chinese. A day or two later, they raided Gaither's cache and "went directly" to the hiding place of his equipment and seized Gaither and Lauri.

The *modus operandi* of the accused also brands him as Gaither's Judas. It must be remembered that in December 1951, the accused had already collaborated with the enemy by making a recording adverse to the interests of the United States. In that same month he informed the Chinese of Dunham's views concerning Communism and the Negro race. That summer, August 1952, he informed on Vincent. Later, in the winter of 1952 the accused was seen talking to a Chinese instructor called Lim. Lim told Dickenson to keep a watch on some men in the First Platoon compound and to find out which of them were trying to escape. Dickenson replied that he would try. Two or three days after this conversation, the Chinese searched the First Platoon area, confiscated supplies which had been hidden there by the prisoners and took several GI's to headquarters under armed guard. From the spring of 1952, the accused was seen going into the quarters of the assistant company commander "three or four times daily every week." Then, in April 1953, Dickenson informed on Jacobson and some friends who had been in the custom of mimicking the Chinese and planning escape. Two months after that, the accused told the Chinese of Jacobson's threat to "take care of him."

Acts of misconduct prior or subsequent to that charged are admissible to show a plan or design on the part of the accused to inform the Chinese of the conversations and escape plans of his fellow prisoners. Manual for Courts-Martial, supra, paragraph 138*g*; see United States v Haimson, 5 USCMA 208, 17 CMR 208; Wigmore, Evidence, 3d ed, §§ 216–217; Wharton, Criminal

Evidence, 11th ed, § 352. The greater the number of consistent facts among the offenses, the more complete the probability that the accused committed each of them. The evidence here shows sufficient points of similarity to justify the court-martial's conclusion that the accused informed on Gaither. Thus, it appears that the accused customarily sought out the victim and questioned him about matters which subsequently turned up in the possession of the Chinese. This is evident with regard to Dunham, Vincent and Gaither. Also, the accused apparently misrepresented his purpose in obtaining the information. As to Dunham, he disclaimed any intimacy with the Chinese; in the first Jacobson incident, he feigned an innocent presence outside Jacobson's hut; with respect to Gaither, the court-martial could reasonably have found that the accused asked Gaither to show him his air panel in order to discover its hiding place rather than for use in his contemplated escape since Obroff already had a similar panel. This similarity of acts fits neatly into the pattern of informing which the accused and the enemy had developed.

Evidence that the accused informed on Gaither is not sufficient by itself to support his conviction ▇▇▇▇▇ of a violation of Article 105. The evidence must also show that he informed "for the purpose of securing favorable treatment by his captors." The board of review found sufficient proof of that purpose in Gennaro's testimony that "after June or July 1952," he saw the accused with candy and tailor-made cigarettes, and in Gaither and Obroff's testimony to the effect that the accused bore no marks of physical punishment and appeared to be treated as a "trustee."

Taken alone, Gennaro's testimony may not be sufficient to show the accused's purpose. If he saw the accused with candy and cigarettes before the offense here, the evidence has no relevancy to the issue; it does not indicate that the reason for the accused's possession of these items was his disclosure of Gaither's hiding place. In June 1952, the accused was already in favor with the camp officials. He had recorded a broadcast for them in December 1951; he had written a number of articles for the camp newspaper; he had disclosed Dunham's hostile attitude toward communism. All these might reasonably have been occasions which earned for him a reward of candy and cigarettes. On the other hand, if we take the July date as decisive, the testimony of other prosecution witnesses shows different activities of the accused's which also could reasonably account for his possession of candy and cigarettes. Thus, Sergeant J. A. Davis testified that he saw the accused "trading chow" for cigarettes and candy. Corporal R. E. Vincent said that in March 1953 he saw the accused with Chinese money, and heard him say, "I hope Comrade Low will be able to buy me cigarettes and sugar and candy tomorrow." Furthermore, in his pretrial statement, the accused notes that he "actually joined the progressive element" in August 1952. Younce testified that the Chinese often had parties for the progressives. It is entirely reasonable to suppose that the Chinese made candy and cigarettes available at these affairs.

A different situation, however, is present with respect to the evidence of more lenient treatment accorded to the accused than to the others who had escaped with him. This evidence supports the conclusion that the accused was motivated by a desire to secure the favor of his captors. True, that evidence is strongly counterbalanced by the accused's statement to Obroff that he "had to tell" because they "put a gun to my head." If that explanation is believed it would establish that the accused's disclosure was induced by coercion rather than by a desire for favor; it would also explain the apparent absence of any marks of physical punishment inflicted upon the accused. But was the court-martial required to accept it?

A court-martial is not bound to believe the testimony of any witness, especially if it is extrajudicial and self-serving in nature. But there should be some sound basis for disregarding evidence which has a very

**463**

important bearing on the issues. The accused's explanation was in evidence and should have been considered by the court-martial. United States v Johnson, 3 USCMA 209, 11 CMR 209. It is not inherently incredible and it is supported by Gaither's testimony of the mock firing squad technique used by the communists. In our opinion, however, the court members were required to and did consider the accused's explanation to Obroff because they were specifically instructed by the law officer that "Duress is a complete defense." However, they concluded that the circumstances surrounding the accused's disclosure of Gaither's escape plans were different from those represented by him to Obroff. In other words, the accused's pretrial statements to Obroff and the counter-intelligence agents were inconsistent.

We think that the other acts of informing by the accused are again significant. The court-martial ▮▮▮▮▮▮ was entitled to weigh the exculpatory statement and decide whether or not to give it credence, just as it could have done if the accused had uttered it from the witness stand. Thus, the members of the court-martial could consider the other misconduct to determine whether this single statement was worthy of belief, in the same way that a court-martial may consider other acts of misconduct to impeach an accused who seeks to show good character. See United States v Haimson, supra; Walder v United States, 347 US 62, 74 S Ct 354, 98 L ed 503. Since there is absolutely no evidence that on any other occasion the accused had been forced to inform on fellow prisoners, the court-martial could reasonably infer that the statement made by the accused was not worthy of belief.

Reading the accused's pretrial statement to the agents in the light of the evidence makes one fact stand out in bold relief. The accused refers to an escape, but nowhere in his nine-page statement does he specifically give the date. He implies that the escape occurred in early 1951. There is no mention of an escape in July 1952. Yet, in his brief, the defense counsel contends that the accused "attempted several escapes." The 1952 escape and the purported coercion after the accused was recaptured have such vital bearing upon his activities as a prisoner of war that it is almost incredible that the accused should have forgotten to mention them, either during his examination by the counter-intelligence agents or during his two and one-half hour reading of the statement. The peculiarity is so striking that it invites close scrutiny of the evidence for a reasonable explanation.

The part of the accused's statement which refers to an escape reads as follows:

"During the early part of 1951, I was like most of the American prisoners, who had no desire to support the Chinese and Communism. I had a desire to escape from camp #5, and set out to plan such. However, I was apprehended by the Chinese in that effort, and placed in jail as a result of my action to get away from the camp. While in jail, I underwent some cruel and brutal treatment. I was threatened by the Chinese, and one told me that he would kill me if I did not agree with the Chinese and abide by the rules and regulations of the camp. They finally released me from jail, and as a result of that gesture of consideration, I decided to go along with the Chinese, find out what I could about their methods of doing things, and eventually return to my country a wiser man, and maybe of some service to my country by telling all that I had learned about the Chinese and Communism."

If, as the accused's counsel argues, there were two escapes, the failure of the accused to give the date of his escape is significant. If an escape occurred in 1951 then why did the accused omit all reference to the 1952 attempt? Certainly, that event was later in time and so unusual that it could not have been forgotten by him. Inclusion of a reference to the circumstances of the 1952 escape would have given support to his contention that he wanted to be "of some service" to the country. It would tend to indicate that he desired to return to American control and turn

over the information he had acquired in the course of his activities. Also, it would be of value in explaining some of the leniency accorded him by the Chinese after the 1952 escape, as for example, the apparent omission of physical punishment.

Assuming, for the purposes of this appeal, that the court-martial could have concluded that two escapes were attempted, one in 1951 and another in 1952, the assumption is more harmful than beneficial to the accused. The accused mentioned the first but disregarded the second. The court-martial could have determined that he deliberately chose to conceal the second escape because the circumstances surrounding it were unfavorable to him. Such concealment provides a sound basis for disbelieving the accused's statement to Obroff that he yielded to the Chinese because they held a gun to his head. Added to the other evidence, it unquestionably supports a finding that he acted "for the purpose of securing favorable treatment from his captors."

The second alternative is that the court-martial found the accused attempted only one escape. His statement does not say unequivocally that he escaped "During the early part of 1951"; it merely implies that the escape took place at that time. A forceful motive for creating that impression is apparent. It would provide a basis for inferring that the wrongdoings he admitted in his statement were the result of the punishment inflicted upon him after an abortive escape. The court-martial, however, could reasonably have concluded that the implication of the accused's statement was deliberately false. It could have found that the escape mentioned in the statement to the agents is, in fact, the one undertaken in July 1952. Substantial support for this construction appears in the testimony of Corporal Flattley.

It will be recalled that in June 1952, the accused talked to Flattley. He told him he did not believe that returned prisoners of war would be punished for writing articles, making recordings, and other acts of like nature. Until then, the greater part of the accused's asso-

ciation with his captors was along those lines. The next month, the accused engaged in preparations for an escape. It is reasonable to suppose that he decided to take his chances on a court-martial for his activities to that date. The escape attempt failed. He was brought back to camp and interrogated. He informed on another prisoner. Did he inform because he was coerced or because he wanted more favorable treatment? The accused's pretrial statement sheds light on that point.

In his statement the accused says that after he was recaptured he was subject to "cruel and brutal treatment" and that someone told him that he "would kill me if I did not agree with the Chinese and abide by the rules and regulations of the camp." These representations are not in agreement with his statement to Obroff, and are inconsistent with the testimony that he showed no signs of physical mistreatment after his recapture and during his confinement. The only reference to coercion set out in the accused's statement is a threat of future harm, not a threat of immediate harm. Moreover, the threat was intended only to insure his compliance with the regulations of the camp and "agreement" with the Chinese. This threat does not square with the accused's statement to Obroff that he was forced to inform because a gun was held to his head. Again, therefore, the court-martial had a solid basis for disregarding the accused's explanation to Obroff and for concluding that he informed for the purpose of securing favorable treatment.

The final argument of the accused is that Gaither's testimony, regarding Tong's reference to Dickenson's escape and that he was not "going to be in jail long," was hearsay and prejudicial. No appropriate objection to this testimony was made at the trial, even though the witness prefaced his statement by noting that he "would have to bring out" what Tong told him. A failure to object ordinarily constitutes a waiver of error in the admission of evidence. United States v Turner, 5 USCMA 445, 18 CMR 69; United States v Fisher, 4 US CMA 152, 15 CMR 152. However, even

if considered on the merits, the accused's claim has no substance.

Reference to general principles and to other cases are of little value. The only question is whether ▮▮▮▮ the inadmissible evidence had a measurable impact on the court-martial in its deliberation on the guilt or innocence of the accused in the case before us. Assuming that Tong's statement to Gaither is inadmissible, it is plainly cumulative. The evidence leaves no room for doubt that Dickenson escaped in July 1952 and that he was recaptured. It is equally certain that the accused disclosed the details of his escape to the Chinese. There is also an abundance of evidence to show that the accused received preferential treatment from the Chinese. This included confinement in a building which had no guards, and employment in such tasks as bringing food to the other prisoners; these would indicate that the accused was not going to be "in jail long." We believe, therefore, that there is no fair risk that Gaither's testimony as to what Tong told him prejudiced the accused in any way. United States v Williams, 5 USCMA 406, 18 CMR 30.

We deny the accused's motion to consider testimony given in the case of United States v Batchelor, supra, in connection with our review of this case.

The decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.